**The ZUNI TRIBE OF NEW MEXICO**

v.

**The UNITED STATES.**

No. 161–79L.

United States Claims Court.

May 27, 1987.

See also 12 Cl.Ct. 607.

---

Stephen C. Boyden, Salt Lake City, Utah (John S. Boyden, Jr., G. Richard Hill, and Boyden, Kennedy & Romney, of counsel), for plaintiff.

D. Lee Stewart (F. Henry Habicht, II, Asst. Atty. Gen., Washington, D.C., John C. Hitzelberg of counsel), for defendant.

## OPINION

YANNELLO, Judge.

Two of the issues presented to this court have been the subject of trial: (1) the extent of the plaintiff's aboriginal land area which would allegedly be the subject of a taking; and (2) the events which allegedly constituted the taking. The parties have proposed findings of fact and briefed issues of law on both of these issues in a single submission.

For convenience, in view of the extensive nature of the evidentiary record and the parties' proposals, the court has prepared two opinions. A separate opinion addresses the first issue, the extent of plaintiff's aboriginal land area, and concludes that, as of 1846, the plaintiff had aboriginal title to the land area claimed. (This area may be seen on plaintiff's exhibit 240, circumscribed within the locations 1 to 20.)

The instant opinion now turns to the second issue: the events and dates which purported to constitute a taking of the aboriginal land.

Again here, as in the opinion describing the extent of the aboriginal land, the court has reviewed the record and the parties' proposed findings and adopts the contentions advanced by plaintiff as being the more persuasive and finds the evidence cited in support thereof to be the preponderant and most persuasive evidence.

Indeed, in connection with the issues addressed in the instant opinion, the events and dates of any alleged taking, defendant has proposed but a few limited findings. Rather, the thrust of defendant's position has been that the Zuni aboriginal land was limited to the area of its central pueblo (rather than to the area used and occupied exclusively by Zunis for life-sustaining activities). *See, e.g.,* defendant's proposed findings Nos. 13, 22, 25, and 29. From this premise, defendant argues that, since this area of the pueblo is within the Zuni reservation, there has been no taking. *See, e.g.,* defendant's proposed findings Nos. 39 and 42. Defendant has proffered no alternative findings addressing the dates and events which, if plaintiff's aboriginal land was found to exceed the pueblo area as plaintiff claims, may (or may not) have constituted an alleged taking.[1]

This court, in a separate opinion, has rejected defendant's premise concerning the extent of plaintiff's aboriginal land. This, however, does not lead to an automatic adoption of plaintiff's proposed findings concerning the dates and events of the alleged taking. Defendant, although not proposing any alternative findings, has opposed plaintiff's proposals, offering cita-

---

1. Likewise, the defendant's brief argues only that, since the Zuni exclusively used and occupied only the area of their central pueblo, the creation of the reservation (as described in the court's Findings) terminated any Indian title and constituted a taking, if any, as of 1883 (when the reservation created in 1877 was enlarged). Similarly, defendant contends that, at that date (1883), the Zuni tribe had abandoned all lands beyond the reservation (if indeed any such lands had been considered aboriginal land).

tions to evidence and refutations to argument.

The court, in the instant opinion, has thoroughly reviewed all the proposals, objections, and responses, and the evidence with reference thereto. It is as a result of that review that the court has concluded that the accompanying Findings, patterned largely upon plaintiff's proposals, are warranted by the record.

The accompanying Findings speak for themselves, and no legal arguments, other than those grounded on resolution of factual disputes, are presented in the briefs.[2]

Suffice it to say here that, as plaintiff contends, any loss of Indian lands can be compensable only if caused by or the result of acts or omissions of the United States. The accompanying Findings illustrate a number of acts and omissions of the United States.

█ Plaintiff cites a number of cases in which such acts or omissions have been held sufficient to constitute a compensable taking by the United States. *See,* for example, *Pillager Bands v. United States,* 192 Ct.Cl. 698, 428 F.2d 1274 (1970) (re: United States exercise of dominion inconsistent with Indian use and occupancy, such as ceding land to another); *Tlingit and Haida Indians v. United States,* 147 Ct.Cl. 315, 177 F.Supp. 452 (1959); *Pueblo of Laguna v. United States,* 17 Ind.Cl. Comm. 615, 697 (1967) (re: failure to protect Indians from encroachment and creating reservations for other Indians on aboriginal land); and a host of other cases cited by plaintiff with respect to the United States' use of aboriginal land for non-Indian grazing, townsites, homesteading, railroad construction (*Cabazon Band v. Unit-*

*ed States,* 21 Ind.Cl.Comm. 119, 128–32 (1969)), for schools in newly recognized states (*Three Affiliated Tribes of Fort Berthold Reservation v. United States,* 182 Ct.Cl. 543, 558–61, 390 F.2d 686 (1968)), and treating aboriginal land as public land (*Cowlitz v. United States,* 25 Ind.Cl.Comm. 442, 448, 450 (1971)).

█ It is concluded that the acts and omissions found by the court here are sufficient to constitute a taking requiring just compensation.

### Conclusion of Law

Based on the foregoing, and the accompanying Findings of Fact, it is concluded that plaintiff's aboriginal title was extinguished by acts or omissions of the United States by virtue of the events, and on the dates, described herein.

The matter will now proceed to a determination of the amount of just compensation to which plaintiff is entitled. The parties shall, within 120 days of the date of this opinion, file a Joint Status Report suggesting a schedule of further appropriate proceedings.

### FINDINGS OF FACT

re:

### TAKING OF ZUNI LANDS [3]

1. TAKING OF ZUNI LANDS
(1846 to 1876)

FINDING NO. 1. *United States Assumes Sovereignty Over Zuni Claim Area:*

Following a war with Mexico, Brigadier General Stephen Watts Kearny, on August

---

**2.** The parties do raise an issue concerning whether plaintiff is entitled to interest on any judgment awarding just compensation. This argument seems grounded in a discussion of "recognized" title, whereas the court, in its separate opinion, has found Zuni aboriginal title. In any event, based on the Findings in that separate opinion as well as the instant opinion, such legal issue can be addressed at a later time (when the amount of just compensation is under advisement).

**3.** The court issued a separate opinion concerning the extent and location of the plaintiff's aboriginal land area. (The Findings of that opinion are incorporated herein to the extent they may be relevant.) In that separate opinion, the court set forth its findings with a footnote. That footnote is incorporated herein as well. The Findings herein, relating to the events and dates of taking, like the findings on aboriginal land, follow closely the findings proposed by plaintiff. The court found plaintiff's contentions, and the evidence cited in support thereof including the extensive testimony of its

18, 1846, took possession of Santa Fe, the capital of New Mexico, in the name of the United States. On August 22, he issued a formal proclamation of annexation and stated that New Mexico was a territory of the United States. With the imposition of the Kearny Code of 1846, the United States began its exercise of sovereignty over the Southwest area, and the Zunis. The Treaty of Guadalupe Hidalgo was signed February 2, 1848, ratification exchanged with Mexico on May 30, 1848, and proclaimed July 4, 1848. This treaty formalized United States jurisdiction over the area, and the Zuni.

Prior to the statehood of Arizona and New Mexico, in 1912, inhabitants of the area, including the Zuni, were subject to the Territorial Laws of the United States.

FINDING NO. 2. *Zuni Property Rights Recognized Under Treaty of Guadalupe Hidalgo:*

The Zuni Indians were recognized as vassals and subjects under the Spanish crown and later as citizens of Spain. Spanish citizenship was affirmed by Mexico on February 24, 1821, in the *Plan de Iguala* which declared that all inhabitants of New Spain, whether Indians or not, were citizens and their persons and property protected under the new Mexican government. These rights were reaffirmed in the Treaty of Cordova of August 24, 1821, in the Declaration of Independence of Mexico on October 6, 1821, and by Act of the Mexican Congress.

Under the Treaty of Guadalupe Hidalgo of 1848, citizens of Mexico, which included the Zunis, were entitled to the guarantees of protection of "liberty and property" and security "in the free exercise of their religion" without restriction. Since Spain and Mexico had recognized the Zunis' right to permanently use and occupy their aboriginal territory, the Zunis became subject to the sovereignty of the United States with the same right to aboriginal lands intact.

FINDING NO. 3. *Ojo del Oso Described as Zuni Territory:*

Ojo del Oso (which is marked by an "X" on Plaintiff's Exhibit 240) was described by

expert witnesses and their reports and supporting material, to constitute the preponderant,

Major Gilpin of the United States Army as being in the Territory of the Zunis. A detachment led by Major William Gilpin, later to become the first governor of Colorado, reconnoitered Navajo country by following the San Juan and then traveling south into the Tunicha Mountains and descending into Canyon del Chelly. He talked with nine Navajo chiefs and then met Colonel Doniphan at Ojo de Oso or Bear Springs, in what he described as "the territory of the Zunis," thus definitely locating Ojo del Oso within the Zuni claim area as of 1846. Colonel Doniphan and Major Gilpin's parties, after meeting at Bear Springs, marched south to the Pueblo of Zuni where they were hospitably received. Shortly before Colonel Doniphan and Major Gilpin's visit to Zuni, Captain Parsons had also visited Zuni. After pursuing Navajo raiders west of the Chuska Mountains, sixty men under Captain Monroe M. Parsons came to Zuni destitute of supplies, after an exhausting three days march. As recorded by Private Marcellus Ball Edwards, the soldiers had nothing but praise for the warm hospitality and generosity of the Zuni people.

FINDING NO. 4. *Major Walker Finds No Navajos in Zuni Territory:*

Because of many Navajo raids upon the New Mexico settlements in the summer of 1847, Major W.H.R. Walker was sent on a punitive expedition against the Navajos in early September. Leaving the Rio Grande below Albuquerque the troops marched westward through Zuni then north to Red Lake outside of the claim area as far as Canyon de Chelly. The troops had used most of their supplies before reaching Zuni, and when they turned to the north to look for hostile Indians the Navajos kept moving farther north as they were pursued by the troops. No Navajos were encountered by United States troops in the Zuni claim area in 1847. No crops were found in Canyon de Chelly. The troops were forced to turn back to Zuni. When the Zunis

and the more persuasive, evidence.

found United States troops in distress, they gave them provisions and treated them kindly and hospitably.

FINDING NO. 5. *Zunis Protected Themselves Against a Navajo Raid:*

In late summer of 1849 Colonel John M. Washington launched an expedition northwest from Jemez into Navaho country. He was accompanied by the newly appointed Indian Agent James S. Calhoun and Topographical Engineer James H. Simpson. After completing a peace treaty with Navajo leaders in Canyon de Chelly in September of 1849, a report was received that Apaches had attacked Zuni. The expedition returned by way of the Pueblo of Zuni to find that Navajos, and not Apaches, had made an attempt to run off livestock, but had been repulsed. The unburied body of one of the Navajo raiders was found only one-half mile from the Pueblo of Zuni. The expedition received a hearty reception from the Zuni upon its entry into the Pueblo, and the party was fed bread in many varieties, watermelons, muskmelons, and peaches.

Agent Calhoun had lengthy discussions with Governor Pedro Pino of the Zunis. Calhoun later wrote to Commissioner Medill that (based on his own knowledge obtained during Washington's expedition against the Navajos) the Navajo raids were for plunder rather than out of necessity since the Navajos possessed in their own country extensive fields of corn, wheat, melons, squash, beans, peas, and peach orchards in addition to their immense flocks of sheep, mules, and horses.

FINDING NO. 6. *Military Officers Observe Extensive Zuni Land Use:*

Lieutenant James H. Simpson reported that the Zunis had large herds of sheep and horses and extensively cultivated the soil. As he moved up the Pescado Valley from the Pueblo of Zuni, he noted further evidence of Zuni agriculture in outlying areas: "We have met today, as we did yesterday, a number of Zuni Indians carrying bags of wheat upon horses and burros to their Pueblo. These people seem to have discovered the principle of industrial accumulation, and therefore of social progress, more than of any Indians I have seen." The

expedition was also informed of a band of California emigrants that had commandeered livestock and supplies from the Zunis' accumulations. Calhoun wrote that the emigrants committed "outrages" against the Zunis and, with the same frequency and as flagrant, against the Laguna. Such outrages, as described by Calhoun, included "taking in the name of the United States such horses, mules and sheep and grain as they desired...."

FINDING NO. 7. *United States Prohibits Zunis From Protecting Themselves:*

On October 15, 1849, Governor Pedro Pino and the Grand Captain of War from Zuni, together with a Zuni delegation met with Calhoun in Santa Fe. Calhoun reported that the Zunis asked for arms and ammunition and for permission to make a war of extermination against the Navajos. The Zunis spoke confidently of their ability to protect and defend themselves against the aggressions of the Navajos and Apaches and stated that if permitted to form a combination of Pueblos, they could and would exterminate those tribes. The Zunis' request for fire arms and ammunition was denied by Agent Calhoun. Colonel Washington would not give his consent to the Zunis taking any direct action against either the Apache or the Navajo. (The general United States policy was not to arm any Indian tribes.) Promised military protection by the United States was ineffective, and in January of 1850 the Zunis reported that Navajos had again raided the Pueblo, stealing livestock and carrying off two women. A United States officer then sought out the Navajo raiders, but without success.

FINDING NO. 8. *Calhoun Requests Treaty Authority to Protect Pueblos:*

On November 15, 1849, Calhoun recommended to the Commissioner that he be authorized to make treaties with the Pueblos to bring them under the protection of federal law. In reviewing the Pueblo Indians' former relationship with the governments of Spain and New Mexico, he made the following observation:

The former government of this territory, having never interfered with their pecu-

liar form of governments, each Pueblo has had, from time immemorial, a separate and distinct political existence—Instances are now occuring of Prefects and Alcaldes extending the operation of some of the laws of this territory over these people—a matter they can not comprehend, and of which, they daily complain, and beg for relief. Add to this, the fact, they are no longer authorized to make reprisals upon the wild Indians who annoy them so much, and you have the causes of the uneasiness, and the distrust, which they sometimes manifest.

### FINDING NO. 9. *Pueblo Treaty of 1850 Never Ratified:*

Agent Calhoun was granted authorization by Commissioner Brown on April 24, 1850, to negotiate Pueblo treaties. Zuni Governor Pedro Pino arrived at Santa Fe on August 7 and signed, on behalf of the Zunis, a treaty which provided the boundaries of each Pueblo Tribe would be settled and never diminished, as set out in paragraphs 4 and 5 of the Treaty:

4. The Government of the United States will, at its earliest convenience, afford to the contracting Pueblos its protecting power and infuluence; will adjust and settle, in the most practicable manner, the boundaries of each Pueblo, which shall never be diminished, but may be enlarged whenever the Government of the United States shall deem it advisable.

5. It is expressly understood and agreed by the contracting parties that the respective Pueblos are to be governed by their own laws and customs, and such authorities as they may prescribe, subject to the controlling power of the Government of the United States.

On the occasion of the treaty signing, the Zunis bluntly criticized the government's lack of good faith illustrated by four years of empty promises of protection.[4]

The United States, through its Senate, failed to ratify the treaty drafted on August 7, 1850.

### FINDING NO. 10. *Breach of Treaties Protecting Zuni:*

Military and other government officials negotiated several agreements with Navajo and Pueblo leaders in efforts to stop the Navajos from molesting or stealing and to bring peace to the New Mexico area.

Among these negotiations were the following:

The first treaty, was signed on November 21, 1846, but was not ratified by the U.S. Senate. This document was directed to the Navajo, but specifically included the Pueblo Indians in its provisions. Article One of that treaty provided for the firm and lasting peace and amity between the American people and the Navajo Tribe. Article Two provided that the Pueblo Tribe of Indians were included in the term "American people."

In July 1848, Lt. Colonel Henderson P. Boyakin, Zuni Governor Pedro Pino and War Commander Antonio Chapeton signed Articles of Convention. The articles provided that the Zuni Tribe would be: "Protected in the full management of its right of private property and religion, by the authorities, civil and military, both in New Mexico and the United States." (No formal treaty was drafted based on these articles.)

The treaty of 1850 was signed by Governor Pino in the presence of a Zuni delegation that traveled to Santa Fe to sign the treaty with James S. Calhoun. The draft treaty was not ratified by the U.S. Senate. In that draft treaty, the United States bound itself to protect the Zunis from raiding Navajos, while the Zunis themselves were prohibited from pursuing military campaigns against the Navajos without the consent of the territorial authorities of Santa Fe.

On October 26, 1851, Major Electus Backus, without authorization from Commander Colonel Edwin V. Sumner, entered into a verbal agreement jointly with the Navajo headmen and representatives of the Zuni

---

4. Some of the Zuni discontent centered on the removal of American troops from Cebolleta (there affording protection to the Zuni) to Albuquerque (there affording protection to the Rio Grande area)—at a time when the Zuni were being subjected to Navajo attack.

and Hopi tribes. The agreement was made at the newly constructed Ft. Defiance. The first condition was that, "the Navajo Indians shall be at peace with, and shall cease to molest or steal from, the people of the United States, the Mexican people and our friends the Zuni and Moca [Hopi] Indians."

Governor Calhoun and Colonel Sumner met with a large group of Navajos at the Pueblo of Jemez on December 25, 1851, and informally agreed to ratify Backus' agreement. (See also preceding paragraph.) Major Backus, who (although the agreement was not ratified by the U.S. Senate) insisted on calling the verbal agreement "The Treaty of October 26, 1851," informed Colonel Sumner on January 4, 1852, that Zarcillos Largos, Navajo headman, had assured him that all Navajos considered the agreement binding and were anxious to abide by it.

Notwithstanding the foregoing agreements made, or treaties proposed or drafted with, the United States, the Navajos continued raiding and harrassing the Indian Pueblos and the settlements along the Rio Grande. The Zunis were prohibited, by the United States government officials from taking any action to defend themselves. Orders of the United States provided that arms were not to be furnished to the Zunis and withheld any consent to the Zunis to take any direct action against either the Apache or the Navajo.

FINDING NO. 11. *Expedition of Captain Lorenzo Sitgreaves Observes Zuni Agriculture:*

In 1851, an expedition of Army topographical engineers under the direction of Captain Lorenzo Sitgreaves, which included cartographer Lieutenant J.G. Parke and civilian draftsman Richard H. Kern, accompanied a military expedition led by Colonel Edwin V. Sumner. The engineers were dispatched to explore and map the area westward from Zuni to California following the Zuni River to is junction with the Colorado and the latter river to its mouth. When the expedition reached Zuni, they received complaints of Navajo harrassment and Colonel Sumner directed the campaign towards Canyon de Chelly. The campaign against the Navajos was unfruitful because of the Navajo's refusal to stay and fight and Sumner returned to Santa Fe. However, he had directed Major Backus to construct Ft. Defiance.[5] Meanwhile, the Sitgreaves party remained at Zuni until Major H.L. Kendrick was available to serve as military escort.

The group traveled from Zuni to the Colorado River and west to San Diego. Sitgreaves noted the extensive Zuni cultivation along his route, observing that: "The cornfields of the Zuni Indians extended at intervals for several miles down the stream, their crops and orchards being planted on the edge of the valley or in the fertile gorges of the mountains." Traveling down the right bank of the Zuni River, the expedition crossed the streambed just before reaching the Little Colorado River. The next day, just prior to reaching the Little Colorado River, they met a party of *Coyotero Apaches* driving mules to trade at Zuni. The official map of the expedition drawn by Kern, depicts the Chuska Mountain north of the Zuni claim area as "Navajo Country" and places the Apaches south of the Zuni claim area below the Mogollon Rim.

FINDING NO. 12. *Domenech Describes Northern Boundary of Zuni Country:*

Abbe. Em. Domenech claimed to be in the Zuni region for seven years in the

---

5. The location of Fort Defiance is shown on the map in Plaintiff's Exhibit 240, and related sequential exhibits. The court has found, in a separate opinion, that the area of the Zunis' aboriginal land area is depicted on that exhibit as the area circumscribed within locations 1 to 20. Throughout the parties' proposed findings there appears to be some semantic disagreement concerning the location of Fort Defiance. Based on the court's Findings in its separate opinion concerning Zuni aboriginal land, it is concluded that the Fort is located between points 14 and 15 on Exhibit 240, and that at that location it lies on the edge of or just beyond northern boundary of the Zuni claim area. (The aboriginal land area was determined in the separate opinion based on considerable evidence wholly apart from the location of the Fort itself.) For sake of convenience, in this opinion, the court is comfortable in adopting plaintiff's phraseology in locating the Fort "at Zunis northern boundary".

1850's. During his travels, he came from the San Juan River area of the north into the Canyon de Chelly area describing that as Navajo country. Then he described the border between the Zuni and Navajo country: "On emerging from Canon Bonito you penetrate into the Zunis country...." This description identifies the northern boundary of the Zuni claim area in the 1850's to be north of Ft. Defiance at the south end of Canon Bonito between points 14 and 15 on Plaintiff's Exhibit 240.

FINDING NO. 13. *Ft. Defiance Established on Zuni Boundary:*

The construction of Ft. Defiance at the direction of Colonel Sumner, with the accompanying permanent location of United States troops at the Zuni border, brought a measure of protection to the Zuni Pueblo from Navajo depredations. The Fort was commanded by Major Backus in approximately 1851–52 and, beginning on September 8, 1852, by Major H.L. Kendrick.[6] Major Kendrick made a determined effort to treat the Navajo fairly and to encourage and assist them in peaceful pursuits, but at the same time to confine them to their own area of habitation. His task was complicated by continuing pressure on the Navajo by the Utes to the north. The Zuni Tribe provided most if not all of the corn supply for horses at Ft. Defiance.

In 1853, Kendrick opened a new road from Fort Defiance to the Ojo del Oso and through the Wingate Valley on the east side of the Zuni Mountains to intercept the old trail which led from the Ojo del Gallo. Supply trains then began purchasing corn at Laguna Pueblo. As a result of the Kendrick road, Ojo del Oso became a regular stopping place for military wagon trains.

Navajos began to reside in the immediate area of the United States forts, at Defiance and Ojo del Oso. Later those Navajos were forcibly removed to Bosque Redondo.

6. For a brief period between Majors Backus and Kendrick, the Fort was commanded by Colonel J.H. Eaton. Eaton's descriptions at the time

FINDING NO. 14. *Zuni Economy Robust in 1853:*

Francois Ex Aubry, a Southwestern trailblazer, returning from California in September of 1853, noted in his journal that when his party reached the Pueblo Zuni from the west they were "... met with a hospitable and civilized population from whom we obtained an abundance of good provisions, over which we greatly rejoiced. We have subsisted for a month on mule and horse flesh, and for the most of that time on half or quarter rations."

In late November of 1853 the Whipple expedition traveled through Zuni country. The Expedition was part of the War Department's Congressionally-mandated project to survey the Trans-Mississippi in order to locate the best route for the railroad to the Pacific coast, and was under the direction of the Army Corps of Topographical Engineers. After leaving the Laguna Pueblo, one group followed the Kendrick or Ojo del Oso road through the Wingate Valley. Whipple, with the main survey and supply trail, used the Ojo del Gallo route and came south through the Zuni Mountains using the Camino del Obisbo, passed by Inscription Rock, and through the Zuni farming lands of the Pescado Valley.

The Whipple group camped at Black Rock and waited for the arrival of the other group. Several Zunis came to the camp. According to Baldwin Mollhausen, the expedition's naturalist and draftsman:

The project of establishing a direct communication with the coast of the Pacific seemed to strike them [Zunis] wonderfully, and it was not long after they were informed of it, before Pedro Pino, the *Gobernador* of Zuni, made his appearance in state costume with two of his chiefs, to introduce himself to us, and obtain further information concerning the direction of our journey....

have been challenged as to accuracy and impartiality by expert witnesses. This court concurs

Mollhausen also made the following statement about the Zuni economy: [7]

> The Zuni Indians are more favorably disposed to civilization than those of the other Pueblos. They breed sheep, keep horses and asses, and practice agriculture on an extensive scale. The harvest was over when our Expedition passed, but in all directions fields of wheat and maize stubble, as well as gourds and melons, bore testimony to their industry, and they also raise in their gardens beans, onions, and capsicums [peppers]; the latter especially, immense quantities of which were hanging to dry in garlands over the houses. Besides agriculture and cattle breeding, they, or rather their women, are skillful in the art of weaving, and like the Navajos manufacture durable blankets.

FINDING NO. 15. *Zuni Guides Used in Zuni Hunting Grounds:*

Lt. Whipple was particularly anxious to secure Zuni guides to lead the expedition through the area to the west of Zuni. His requests were made known to the Zunis, and they deliberated on the matter for some time before assigning him three guides. Mollhausen commented that the securing of guides in their own lands was crucial. As Mollhausen described the situation as follows: "... the services of natives who possessed an intimate acquaintance with their own hunting-grounds would be of more avail to us now, than the general knowledge of the most experienced trappers." [See plaintiff's response to defendant's objections to its proposed findings, at pages 181–82; see also quote from plaintiff's exhibit 6108 at page 99.]

On November 28, 1853, the Zuni guides described to the expedition the area over which they would be traveling. Mollhausen noted: "They described the country to the Colorado Chiquito as being a nearly level plain, with springs or permanent water at convenient distances. This is their hunting ground." Supplied with several hundred bushels of Zuni corn, the expedition moved down the Zuni River some nine miles then turned west to Jacobs Well. The guide Hacha then led the expedition to the Little Colorado; the other two guides went to Hopi to secure other guides. Hacha led the Whipple expedition through the Petrified Forest, and crossed the Leroux Wash on December 5, 1853. Anxious to return to the village as soon as possible, since it was the Zuni ceremonial season, Hacha, nevertheless, returned to the Pueblo only after having led them to the vicinity of the present day Holbrook, Arizona.

FINDING NO. 16. *Surveyor General Fails to Determine True Nature and Extent of Zuni Tribe:*

In July of 1854, Congress established the office of Surveyor-General in the territory of New Mexico to investigate land titles in the region. His duties included a charge to investigate and report on all land claims originating under Spain and Mexico which were recognized and protected under the Treaty of Guadalupe Hilalgo. Lands in the area were prohibited from sale or other disposal by the government until Congress had acted on his recommendations.

Pursuant to the above legislation, a Surveyor-General was appointed to investigate Pueblo titles. However, he failed to fulfill the congressional mandate with respect to Zuni by failing to include Zuni Pueblo in his initial evaluation of Pueblo titles and by failing to determine the true nature and extent of Zuni title within the framework of Spanish and Mexican law as the legislation required. As a result, Zuni title to lands within the claim area was not protected by Congress as it should have been had

and concludes that little probity should be attached to these descriptions.

**7.** The quote appears in Plaintiff's Exhibit 6109, a portion (pages 97–98) of an article. The right hand margin of the photocopy is slightly marred, and plaintiff's proposed finding contains in the quote, after reference to capsicums (i.e., peppers or berries) the word "later". The court, upon examining this exhibit (as it has examined all cited exhibits generally) believes the word should be "latter". (The original is not available to the court, but the different reading is without substantive significance in any event.)

the government fulfilled its obligations to the Zunis.[8]

### FINDING NO. 17. *Zunis Protest Hispanic Trespass in Zuni Mountains:*

In 1854, several Hispanic stockmen from the Rio Grande Valley attempted to graze their flocks on the slopes of the Zuni Mountains and in the general area of Mt. Taylor. Both Navajo and Zuni people complained about the encroachment in their respective territories and were accused of maltreating the herders. The Navajos made off with large numbers of livestock, and it was theorized that the sheepmen may have deliberately encouraged such theft so that the government would pay them for their losses. No action was taken to apprehend the trespassers. After negotiating another peace treaty with the Navajos in July 1855, things remained relatively calm to the extent that an entire company of soldiers was withdrawn from Ft. Defiance. However, in the early spring of 1856, raiding in the eastern area again became widespread. Matters became so serious that Major Kendrick urged Commander Garland to plan a general campaign against the Navajo. Troops were ordered back to Ft. Defiance and the situation again quieted. Kendrick urged the Zunis to increase their planting, and the Zunis provided large amounts of corn, not only to the United States military, but to individual Navajos or bands of Navajos.[9]

### FINDING NO. 18. *United States Military Action and Apache Attacks at Zuni:*

Apache bands located in the San Francisco River drainage north of the Gila River and south of the Zuni claim area had been increasing their raids throughout the settlements west of the Rio Grande during the summer of 1856. Gileno and Mogollon Apaches had been particularly aggressive, striking the villages north from Socorro as far as Tome. Lieutenant Colonel Daniel J. Chandler led a scouting expedition following the trail of marauding Apaches to the Gila River and inflicted losses on the bands of the Mimbres Apaches. This United States military action was followed by increased and more widespread Apache raiding and reprisal. In October, a band of Coyotero Apaches seized a flock of Zuni sheep. The Zunis pursued the raiding Apaches, recaptured the flock, and killed one Apache. Prior to that time, the Coyotero Apaches had frequently come from their area south of the Mogollón Rim between the White Mountains and the Pinals to trade at Zuni. Due to widespread Apache hostility, Major Kendrick led a detachment out of Ft. Defiance in November to patrol the region south of Zuni. He was joined by Salvador, the Zuni war captain and several Zuni warriors. Also accompanying the expedition was Navajo Agent Henry L. Dodge. Leaving camp to hunt for deer, Dodge was killed some thirty miles south of Zuni by a group of Coyotero and Mogollon Apaches. The soldiers tried, but could not find the fleeing Apaches. Shortly thereafter, the Apaches attacked Cubero, east of the Zuni claim area, killing nine Anglos, they seized sheep from Laguna, and raided into the Puerco. The Apaches then attacked Zuni, on December 22, killing ten people and stealing 1,200 sheep and other stock. The United States military tried to enlist Zunis as spies and guides in the Apache campaigns, but the Zunis refused.[10] The army defeated bands of Coyotero, Mogollon and Warm Springs Apaches and by September, 1858, the Apaches were on peaceful terms with the United States, and with the Zunis as well.

### FINDING NO. 19. *Zunis' Northern Boundary and Navajo Attacks:*

During October of 1857, a new agent was assigned to the Navajo Agency, Wil-

---

**8.** See also the court's separate opinion on the extent of plaintiff's aboriginal land area, and Finding 44 regarding spurious land grants.

**9.** Plaintiff notes that, as this court has found, the Navajo did not act in a united or concerted tribal way but rather by disparate bands—some friendly, some hostile—both in their treatment of the Zunis and in negotiating with the United States.

**10.** The parties have cited evidence suggesting a variety of reasons for this refusal, including the fact that the request was made at a time of Zuni religious observance and the Zuni appraisal that the weather was not auspicious (with deep snow and their horses too thin). The court does not conclude that a resolution of the reasons for the refusal is substantively significant.

liam R. Harley. He was soon made aware of deteriorating relations between the Zunis and the Navajos due to Navajo thefts from Zuni fields. He planned to go to Zuni in person, but before he left the Navajo Agency, the Zuni Governor, with a war captain and nine others, arrived at his office in an attempt to settle the difficulties. Harley reported:

> I immediately caused a council of the Navajos to be assembled. It appeared during the investigation that the Navajos had been commiting depredations on the cornfields of the Zunias [sic] and that a Navajo woman had been killed by the Zunias [sic] whilst taking corn. The Zunias [sic] had taken a number of horses belonging to the Navajos....

Harley settled the matter by requiring the Navajos to pay for the corn and the Zunis to return the horses and pay for the death of the Navajo woman according to "the Indian usage." In the following year, Zunis willingly volunterred to serve as guides and scouts for the United States military forces in a campaign against the Navajos. Approximately 160 warriors with four head war chiefs served with Colonel Dixon S. Miles. The Zunis saved the Fort Defiance cattle and horse herd in Canon Bonito by driving off 300 mounted Navajos. Unfortunately, the Zunis viewed Colonel Miles' ability as an Indian fighter as inept and this caused the Zunis to return home in disgust.

FINDING NO. 20. *Zuni Agriculture Continues to Prosper in 1857:*

Lieutenant Edward F. Beale received the assignment to construct a wagon route along the 35th parallel from Ft. Defiance to the Colorado River. The experimental use of 76 camels as draft animals was unique and his group became known as the "Camel Corp Expedition." Arriving at Zuni on August 29, 1857, Beale noted the extensive cornfields along the way and the excellence of the wheat. As described by Lt. Beale, the amount of corn traded the next day was so great that it took his crew all day and half the night to shell it; at the Jacobs Well camp two days later, in commenting on the efficiency of his camels, he noted that each carried some 750 pounds of corn. On the trip west, Beale had sighted no Indians until well past the San Francisco Peaks outside of the Zuni claim area.

On his return trip, in January and February of 1858, Beale met some rather aloof Navajos with horses and sheep in the vicinity of Navajo Springs. This is the first evidence of any Navajo grazing northwest of the Zuni Pueblo.[11] Just before reaching Zuni he met two Yavapai Indians who had been trading at Zuni. While passing through the Pescado Valley after leaving the Pueblo, Beale commented on Zuni agriculture: "Here the fine wheat of the Zunians is principally raised, and the stubble remaining on the imperfectly cultivated patches, show clearly the natural resources of this beautiful valley."

FINDING NO. 21. *Military Reconnaissance Discloses No Apache or Navajo Habitation Within the Claim Area as of 1859:*

In 1858–1859, reconnaissance expeditions were conducted. One such expedition, in 1859, was led by Major O.L. Shepherd and included two companies led by Lieutenants Bell and Walker.

Major Shepherd, in his daily account for September 9, recorded sighting some Navajo Indians who were encamped in an area outside the Zuni claim area. Describing events on September 13 in the Cebolla Chequito, east of the Zuni claim area, Major Shepherd noted that Navajo appeared to have wintered there. In the account for September 15, Major Shepherd reported that he marched in the old trail from Acoma to the Rita Quemado and "found no Indians had been living here, contrary to what was supposed, probably being too near the Apaches. It is, perhaps, a neutral ground."

The expedition moved to the Zuni Salt Lake, along the Zuni trail, and to the Zuni

---

11. Beale's first-hand sighting was confirmed as to point in time by testimony of plaintiff's expert witnesses.

Pueblo. In the account of September 20, 21, and 22, marching from the Zuni Pueblo and returning to his post, the Major noted: "Judging from the absence of signs on the route from Acoma Mountains to the Pueblo of Zuni, the Navajos do not frequent the region south of the Zuni Mountains, although the climate is warm and the pasturage abundant during the winter months."

FINDING NO. 22. *United States Military Pressure in 1861 Temporarily Forces Some Navajos into Zuni Claim Area:* [12]

In 1860–61, the United States engaged in actual war with the Navajo. The pressures of troop movements and burned crops forced some Navajos to seek refuge in Zuni territory in the region along the north bank of the Puerco of the West and into the Zuni Mountains. Reports of troop movements indicated that these were areas of refuge rather than of previous occupation.

FINDING NO. 23. *Zunis Drive Navajos From Zuni Mountains:*

Captain Lafayette McLaws was in charge of a large force which covered the area north of the Puerco as far as the Little Colorado. He found very few Navajos in that area. He found a few Navajos near Jacobs Well and, upon questioning the Navajos concerning the country, noted that they represented to him that they had never heard of the Little Colorado River and had not known of its existence. McLaws met Governor Pino and a party of Zunis who were returning from a Navajo "hunt" or expedition of their own. Governor Pino told them that anouther Zuni group was still out and that his people intended still further expeditions against the Navajo. Colonel Edward R.S. Canby dispatched troops from Ft. Fauntleroy (the Fort established in 1860 at Ojo del Oso) to pursue raiders who had stolen mules from Blue Water east of the fort and then fled to a hideout in the Zuni Mountains. The camp was finally located deep in the Zuni Moun-

tains as were the bodies of three dead Navajos. Col. Canby reported that the camp had probably been attacked by Zunis.

FINDING 24. *Navajos Taken By Force to Bosque Redondo:*

General John H. Carleton laid plans for a systematic campaign, first against the Apaches, then against the Navajos, placing Christopher (Kit) Carson in command in September of 1862. In October, Fort Wingate was established at the Ojo del Gallo in preparation for the Navajos campaign. Ft. Sumner, established on the Pecos River in a regin known as the Bosque Redondo, was designated as a reservation for the Mescalero Apaches and the Navajos when they surrendered or were captured. By the spring of 1863, Carson assembled his forces at Ft. Defiance, which was temporarily renamed Ft. Canby. For the next five months, Carson carried out a devastating campaign throughout the heartland of the Navajos, scattering them in all directions as they tried to elude the United States troops. Some Navajos evaded capture by hiding within the mountain areas on the periphery of the Zuni claim area. However, reconnaissances made throughout the 1860's offered no evidence of occupation of any Navajos other than those hiding and moving frequently to avoid United States troops.

The Zunis participated in the campaign by direct action of their own as well as in furnishing supplies and guides for the troops. Carson obtained corn and secured the services of guides to take him through the Little Colorado River area. The Zunis joined Carson in his slash and burn rampage, but soon it became evident that the Army was not completely discriminating in its practices; there are indications that Zuni fields were burned and Zuni people victimized.[13]

---

12. Defendant here, in Finding 22, as in some of the findings addressed in the separate opinion concerning aboriginal title, objects to plaintiff's proposed finding as being based solely on the unsupported statement of plaintiff's expert witness. In cases of the type here, expert testimony is quite appropriate and the expert's opinion

(including re-creation of facts through expert deduction and hypothesis), if based on adequate premises and background or underlying supporting evidence, is entitled to form the basis of a fact finding.

13. See also footnote to Finding No. 22 [n. 12].

Nonetheless, Carson had high praise for the services of the Zunis, whom he described as "employed as spies; I am greatly indebted for the zeal and ability displayed by them...." During the Carson campaign, Roman Catholic Bishop John B. Lamy and Father J.M. Coudert witnessed a scalp dance in the Pueblo of Zuni celebrating a victory over the Navajos.

Navajo resistance weakened, and, by the end of 1864, Navajos numbering some 8,000 were incarcerated at Bosque Redondo. It is estimated that this number accounted for three-fourths of the Navajo people. Many Navajos remained at large but moved deeper into their own country, while a few friendly Navajos may have been hidden or harbored by the Zunis.

FINDING 25. *Navajos Released from Bosque Redondo to Reservation on North Side of Claim Area:*

In 1868, after four years of captivity at Bosque Redondo, the Navajos signed a peace treaty with the United States allowing them to return to a reservation north of Zuni territory. Sometime after 1868, a small group (of perhaps several families) of Navajos settled in the Ramah area, contrary to the stipulations of the treaty. A Navajo presence, however, was not noted by military reconnaissance of this area in the late 1860's and early 1870's. There are indications that these Navajo families settled in the area with the consent of the Zunis.

Relatively large numbers of Navajos, who had found refuge in the mountainous areas along with southwestern, southern and southeastern periphery of the claim area, stayed on and settled in these areas, as did Apaches fleeing from United States troops in the south. The establishment of the Navajo reservation did not confine the Navajo to their heartland.

With the final subjugation of the Navajos completed, both Hispanic and Anglo settlers began to push into Zuni territory. In 1869, the area around San Rafael was settled by Hispanic homesteaders. At least one Hispanic settlement was established at St. Johns some time prior to 1873.

FINDING 26. *Zunis fight further encroachment until ordered by United States to stop.*

Throughout the 1870's, the Zunis defended their borders against encroachments of Navajos and non-Indians. The press reported that a major battle was rumored to have taken place in 1873 between the Zunis and the Navajos on the banks of the Rio Puerco of the West was reported. The fight reportedly claimed the lives of thirty Navajos and fifteen Zunis. In that same year, Timothy O'Sullivan, the early western photographer, happened to document a war dance at Zuni. (It cannot be said with certainty whether this dance related to victory in the rumored confrontation with the Navajos or commemorated some other event.) According to Zuni customs, such a dance is held spontaneously to celebrate a sudden or unexpected victory. The O'Sullivan photograph shows spears, muskets, and rifles in the hands of Zuni men, who were dancing.

In 1875, when the Zunis complained to the agent in Santa Fe that the Mexicans were bringing large flocks of sheep into what they considered to be their country, they were told by the Indian Agent that they could not drive the trespassers away, but that they should share the range. The Agent advised that, beyond the area of the Zuni central pueblo, the Zuni and anyone else had equal rights. (Such equal rights applied, for example, to "adjacent grazing country" claimed the Agent.)[14]

---

**14.** Accordingly to the letter written to the Zuni by the Indian Agent, his appraisal was based on the following:

> I went to the Surveyor General's office to see your original grant from the Mexican Government—the papers you left there last year for safe keeping—and find that the Pueblo of Zuni was granted by this document a tract of land described as follows: * * *

> You see by this that you are actually entitled to one league [in] each direction from the Pueblo.

(Pltf. Ex. 7360. The court provides this citation only because it does not appear in the citations furnished by the parties in connection with the proposed finding or objections thereto.)

> It is not entirely clear to the court to what grant the Agent was referring, but only one grant has been called to the court's attention—

The Zunis followed the counsel of their Agent in Santa Fe and the legal authorities of the United States and, instead of using force to drive the Mexican-Americans out of their country, they abided by the orders given to them by the United States government.

FINDING No. 27. *Acts or Omissions of the United States resulting in Taking of Zuni Land:*

During the period 1846 to 1876, the following acts or omissions of the United States resulted in the loss of land by the plaintiff Zuni Indian Tribe:

A. The United States, from the time it assumed jurisdiction over the Southwest in 1846 and as commemorated in the Treaty of Guadalope Hildage (and as echoed in U.S. officials' agreements directly with the Zuni), guaranteed to protect the Zunis' rights to their property. Notwithstanding this obligation, the United States, by Acts of Congress and actions of U.S. officials implementing government policy, failed to respect and protect the Zuni right to its aboriginal lands (particularly the "sustaining area"). Rather, the U.S. acknowledged the Zuni rights only in their central pueblo

area. (See, e.g., Findings 16 and 26, and footnotes 8 and 14 therein.) [15]

(B) United States military efforts to maintain peace throughout the area, and related efforts to quell the Navajo and Apache raids, caused Navajo and Apache to intrude into Zuni lands. (See, e.g., Findings 18, 22, 25, and 26.) [16]

For example, when U.S. Col. Kit Carson sought to capture Navajo for containment in Bosque Redondo, individual Navajos, in an attempt to evade Carson, began to occupy portions of the Zuni claim area where they previously had never been (specifically in the western portion of the claim area in the State of Arizona, south of the Little Colorado River, in the high mountains in the southern periphery of the claim area in the States of Arizona and New Mexico, and in the southeastern portion of the claim area in the Datil Mountains).

Moreover, as part of its policy of peace and against arming Indians, the United States forbade any Zuni defensive or retaliatory military action, promising instead to provide U.S. protection. The U.S. protection was ineffective. For example, in October 1849, a Zuni delegation asked Superintendent Calhoun for arms and ammunition

and it contains the same description of land as in the grant noted by the Indian Agent. That grant is the subject of the court's Finding No. 44 in its separate opinion on aboriginal title. There the court found that the alleged grant referred to here was spurious.

Notwithstanding the grant in issue, the Mexicans, as the Spanish before them, recognized the Zunis' right to, and permitted the Zunis to, continue such use and occupancy of lands as they had been accustomed to prior to the assumption of Mexican, or Spanish, jurisdiction (i.e., to the lands the Zuni had used since time immemorial).

The American Indian Agent was apparently acting in accord with United States policy. The Act of July 1854 established the office of Surveyor-General (S–G) and provided that the S–G was to determine, inter alia, the scope of Indian land areas and titles and further provided that, until Congress acted on the S–G's recommendations, no lands in the area were to be disposed of. (See also Finding 16.)

The United States government apparently determined Indian land based solely on recorded grants. Whatever the merit of this approach in general, in the case of the instant Tribe this treatment deprived the Zunis of their land. Even if the United States government had rea-

son to accredit the grant in issue (without further verifying its authenticity), the fact remains that, through 1846, the Zunis had aboriginal title to (and exclusively used and occupied) an area much larger than the area of its pueblo (which pueblo area is described in the alleged grant). Indeed, the Zuni aboriginal area has been found by the court to include a much larger area sometimes referred to as the "sustaining area". The United States neither recognized nor respected the Zunis aboriginal title but indeed, apparently relying solely upon the grant in issue, treated the larger area or "sustaining area" as public or in the public domain. (This continues to be defendant's express view. See, e.g., objections to plaintiff's proposed finding 111(G), (H), (I) and (J).)

15. Certain findings are specifically cited merely for convenience. This by no means implies that the cited finding and/or event is the only, or even the primary, support for the conclusions stated herein.

16. The defendant contends that its efforts and proscriptions were laudable peace-keeping activities. However this may be, it nevertheless caused intrusion on Zuni land and rights.

and permission to make war against the Navajo, since the U.S. had failed to provide adequate protection. The request was refused. The Zunis also complained about the allocation and deployment of U.S. military. (See, e.g., Findings 7 and 9, including footnote 4.) [17]

(C) The United States appropriated land and water for its own use around Ojo del Oso in the Wingate Valley with the building of the Kendrick Road in 1853 and the establishment of Ft. Fauntleroy in 1860. The United States established Ft. Wingate at Ojo del Gallo in 1862. In 1868, both forts were combined at the original site of Ft. Fauntleroy, and the size of the fort called Fort Wingate was increased substantially. Army officers shortly thereafter began to appropriate grazing lands for their own animals in the vicinity of Ft. Wingate, as well as allowed individual Navajo families to settle in close proximity to the fort.

(D) In 1868, the United States, by treaty of 1868 with the Navajo Indians, took the northern fringe of the Zuni claim area including the southern fringe of Chuskas and Mexican Springs. [See Plaintiff's proposed Finding 111(G) and Defendant's proposed Finding 38.]

(E) In 1876, Mormon settlers established the towns of St. Joseph, Holbrook, and Woodruff along the Little Colorado River in the western Zuni claim area in the State of Arizona. The United States permitted the establishment of said settlements in derogation of the Zunis' rights to the area.

(F) The United States exercised dominion over Zuni lands and resources and over the ways of life of the Zuni people, inconsistent with, and without consideration for, Zuni interests, treating Zuni land as though it were in the domain of the United States.[18]

(G) The United States allowed trespass on Zuni lands for the purpose of mining, homesteading, timber cutting, and other uses totally inconsistent with Zuni ownership.

FINDING 28. *Description of land taken (1846–1876):*

The descriptions of the Mormon settler Ammon Tenney in 1876, of ethnologist Frank H. Cushing in 1885, and as found in other evidence submitted at trial, outline the lands held by Zuni as of 1877. The balance of the claim area (*i.e.,* the lands which have been found to have constituted the aboriginal area in 1846 but were not within the description of lands held by Zuni in 1877) can be described as follows:

Beginning at a point located on the Little Colorado River at Leupp, Arizona; thence west to Humphrey's Peak of the San Francisco Peaks located in the State of Arizona; thence south to Mormon Mountain; thence south to the lookout tower on Baker Butte; thence in a southeasterly direction along the Mogollon Rim to Baldy Peak in the Mt. Baldy wilderness; thence south to Willow Mountain, in the State of Arizona; thence east to Willow Mountain in the State of New Mexico; thence northeast to Granite Mountain near the town of Magdalena, New Mexico; thence northwest to Cebollita Peak; thence in a northerly direction around the western fringe of the Malpais (lava flow) to Grants, New Mexico; thence northeast to Mt. Taylor; thence northwest to Hosta Buttes; thence northwest to Mexican Springs; thence west to Ganado, Arizona; thence west to Steamboat Canyon; thence west to Steamboat Wash; thence south along the Steamboat Wash to Twin Buttes, Arizona; thence east to Houck, Arizona; thence in a northeasterly di-

---

17. Defendant argues that the allocation, or reallocation, of its resources was appropriate to the needs of the entire Southwest region. Again, the reasonableness of the United States' action is not the issue. However appropriate its action may be, the United States nonetheless failed to protect the Zunis (while the Zunis were, at the same time, prohibited from taking their own action as they had for hundreds of years previously).

18. See also the discussion in the last paragraph of footnote 14 in Finding 26. Again note that defendant acknowledges that it treated areas outside the central pueblo location (which location it contends is the only Zuni aboriginal land) as in the public domain. (See defendant's objections to plaintiff's proposed findings 111(I), and similar objections.

rection up the Rio Puerco of the West to a point where the Atchison, Topeka and Santa Fe Railroad crosses the Continental Divide; thence southeast along the Continental Divide to the Ice Caves; thence in a southerly direction around the western fringe of the Malpais (lava flow) to the southernmost tip of the lava flow; thence south to Allegros Mountain; thence southwest to Mangas Mountain; thence southwest to Eagle Peak; thence west to the town of Reserve, New Mexico; thence due west to the Arizona/New Mexico state line; thence northwest to Springerville, Arizona; thence north along the Little Colorado River to the point of beginning at Leupp, Arizona. This tract of land (the land taken) is depicted by crosslines on Plaintiff's Exhibit 248. (Plaintiff's exhibit used colored tape to mark the cross-lining, which color did not photocopy adequately. Hence, the court also includes, as an unofficial exhibit, an enhanced map.)

## 2. TAKING OF ZUNI LANDS (1877 to 1900)

FINDING NO. 29. *History of Taking of Zuni Lands*

During the period 1877 to 1900, the United States took a large portion of the remaining Zuni land; this land was particularly valuable because of its water resources.

Early in the period, military officers at Ft. Wingate, engaging in cattle business, appropriated land and water from the Zunis. In 1876, the Mormons settled in a place called San Lorenzo (in western New Mexico) and early in 1877 commenced a settlement in Savoia as well. Shortly thereafter, decimated by smallpox, San Lorenzo appears to have been entirely abandoned and Savoia nearly so. Resettled in 1882, the latter was called Navajo for a time and

finally given the name Ramah, New Mexico.

On March 16, 1877, the Zuni reservation was established by Executive Order. The Zuni people in the area had no survey description whatever of the actual boundaries of the reservation. The reservation was enlarged by Executive Order of May 1, 1883 (to include, inter alia, Nutria Springs and the Ojo Pescado).[19]

In the early 1880's, additional Anglo settlements, including St. Johns, were established on the Little Colorado River drainage; the United States conveyed title to those lands to the settlers allowing mining claims, desert entries, and homesteading. The Atchison, Topeka and Santa Fe Railroad arrived in Gallup in 1882; this resulted in even further intrusions into Zuni aboriginal land area.

Navajos encroached southward between the Pueblo Colorado Wash and the Rio Puerco in violation of their treaty of 1868. The United States did nothing to restrain the Navajos; in fact, the United States appeared to condone such trespassing by issuing individual settlement allotments of land to trespassing Navajos.

Anglos encroached to the south of Zuni; an Anglo obtained title to the Zuni Salt Lake and attempted to prohibit Zuni use of the lake. Some ranchers used the water from the Rio Puerco and the Little Colorado to the west of Zuni.

In the early 1890's, due to loss of a large portion of the Zunis' outlying resources (*e.g.*, portions of the sustaining area), there were reports of starvation at the Pueblo of Zuni. Problems were exacerbated by the United States' attacks on the political authorities of Zuni through a series of arrests and imprisonments of Bow Priests.

In 1893, serious clear cutting of timber on a large area in the Zuni Mountains began. Many people employed by the log-

---

**19.** Under the Preemption Act of 1841, 5 Stat. 453, as amended by the Act of July 22, 1854, the President had authority to establish and enlarge Indian reservations in order to prevent encroachment on tribal lands.

With respect to the 1883 enlargment, Congress appropriated funds for the maintenance of the enlarged reservation.

The reservation was also enlarged by Executive Order of November 30, 1917, and by Acts of Congress on June 20, 1935, and May 15, 1978—the latter of which included Zuni Salt Lake.

ging companies moved into settlements in the Zuni mountains, such as San Rafael, Grants, and Blue Water.

FINDING NO. 30. *Acts and omissions of the United States resulting in taking of Zuni Lands (1877 to 1900):*

The following acts and omissions of the United States resulted in the loss of land by the Zuni Indian Tribe during the period 1877 to 1900:

(A) The United States, under mining, homestead, and desert entry laws, encouraged numerous settlements in the Arizona portion of the Zuni claim area (specifically in the towns of Snowflake, Taylor, Shumway, Pinedale, Showlow, Lakeside and Pinetop) during the period 1877 to 1878 and the settlements of St. Johns, Springerville, Eager, Greer, Nutrioso and Alpine in the period 1879 to 1880. All of these settlements were on lands claimed by the Zuni Tribe; nonetheless, the United States conveyed said lands to third parties, in derogation of the rights of the Zunis.

(B) The actual surveying and construction of the Atchison, Topeka, and Santa Fe Railroad authorized by the Act of July 27, 1866, did not begin until approximately 1880 on any lands within the Zuni claim area. The major part of the construction of the railroad took place during the period of 1880 through 1884. The actual surveying of the checkerboard areas authorized by the 1866 Railroad Legislation was not commenced until the late 1880's and early 1900's. The taking of lands for railroad purposes by the United States directly affected the Zuni claim area, allowing third parties to occupy lands previously used by the Zunis. The influx of many people into the area as a result of the railroad culminated in the taking of a substantial portion of the Zuni claim area.

(C) The United States authorized the granting of alternate sections along the railroad running through the claim area from Grants, New Mexico, through Gallup, New Mexico, and from Winslow, Arizona, to Flagstaff, Arizona. Following the authorizing legislation, the railroad surveyed lands, occupied the route, received patents from the United States, cut timber, mined

coal, and sold lands to third parties. These actions were in disregard of the Zunis' interest in the land.

(D) In connection with the building of the railroad, merchantable saw timber was clear cut from the Zuni Mountains within the Zuni claim area. The Zuni Tribe received no compensation for the timber. The bulk of the timber was harvested between 1880 and 1910.

(E) Commencing in 1877 and continuing through 1882, copper miners appropriated all of the Zuni aboriginal copper mines located in the Zuni Mountains near the present towns of Coppertown and Tinaja, New Mexico. The United States allowed such mining activity by treating the area involved as though it were public lands in derogation of the Zuni rights to the lands. [See also Finding 26, supra, and footnote 14 therein.]

(F) The United States, as trustee, failed to seek recourse under existing laws to obtain legal title to lands belonging to the Zunis.

(G) The United States allowed the appropriation of Zuni Indian water rights in violation of the reserved water rights doctrine.

FINDING 31. *Description of Lands Taken Between 1877 and 1900:*

As a result of the aforementioned acts and omissions by the United States, the following lands were taken from the Zuni Indian Tribe by the United States:

Beginning at a point located on the Pueblo Colorado Wash at Twin Buttes, Arizona, thence southwesterly along said Wash to its junction with Cottonwood Wash; thence southeasterly up the Little Colorado River to Springerville, Arizona; thence southeasterly on a straight line to the Arizona/New Mexico state line located due west of Reserve, New Mexico; thence due east to Reserve, New Mexico; thence east to Eagle Peak; thence northeast to Mangas Mountain; thence northeast to Allegros Mountain; thence north toward the southernmost point of the lava flow, but ending at a point due east of the Zuni Salt Lake; thence west to

North Mountain located in the State of Arizona; thence northwest to The Flattops located in the Petrified National Forest; thence north to The Haystacks located in the Petrified National Forest; thence northeast to a point located seven miles south of Gallup, New Mexico on State Highway 32; thence due east to McGaffey, New Mexico; thence southeast to Tinaja; thence southeast to Ice Cave; thence along the Continental Divide in a northerly direction through the Zuni Mountains, where it crosses the railroad in Wingate Valley; thence to Ojo del Oso; thence along the Rio Puerco of the West to Houck; thence to the point of beginning in Twin Buttes, Arizona. This tract of land is depicted in Plaintiff's Exhibit 249 by cross-lines.

### 3. TAKING OF ZUNI LANDS
(1901 to 1912)

FINDING 32. *History of Taking of Zuni Lands (1901–1912)*

During the period 1901 to 1912, the Zuni population increased. Zuni livestockmen grazed their herds many miles outside of reservation boundaries and farmers continued to work their fields in outlying areas. Government officials planned and build, between 1904 and 1907, the Black Rock Dam located above the Pueble of Zuni on the Zuni River in an effort to supply irrigation water to tribal lands. Zuni farmers were encouraged to leave traditional farm sites and use new lands located below the dam which would rely upon impounded water for irrigation. Prior to the completion of the dam in 1907, the Zunis had cultivated over 5,000 acres by tradition methods.

After the dam was built, the Zunis cultivated the smallest acreage of farm land in their history. Shortly after its completion, the Black Rock Dam broke and destroyed much of the newly developed farm lands. After its repair, the dam could not hold as much water as originally projected, and farming was further curtailed.

The sheep industry continued to be of great importance to the Zuni people. By 1907, their herds numbered 60,000 and grazed over a wide area. Zunis complained to United States government officials when others started to use traditional Zuni grazing lands.

In 1907, the Zunis still believed that their reservation was much larger than it actually was, and they continued to request surveys to enable them to prevent trespass by other people on what they considered to be "their lands". A survey team arrived in April of 1908, and by July had finished a survey of the reservation boundaries. The new survey, instead of enabling the Zunis to pursue grazing, farming and gathering on their traditional lands, staked out a very limited area for their use. The Zunis requested that the United States enlarge the reservation to include additional lands in all directions, including the Zuni Salt Lake. The Zunis presented many petitions to the government requesting return of their aboriginal territory or the enlargement of the reservation to encompass large tracts of their former territory. Friction arose between Zunis and non-Zunis settlers, over the Zuni use of the southern mountain area (a traditional area of Zuni use) for hunting purposes.

The United States attempted to reduce the area of Zuni use by allotting to individual Zunis small acreages of land for personal rather than tribal use, but the Zuni people resisted.

FINDING 33. *Acts and Omissions of the United States Resulting in Taking of Zuni Lands (1901 to 1912):*

The following acts and omissions of the defendant United States resulted in the loss of land by the plaintiff Zuni Indian Tribe during the period of 1901 to 1912:

(A) The United States continued to encourage the settlement of third parties upon Zuni lands under authority of the Homestead and Desert Entry laws in derogation of the rights of the Zunis to those lands.

(B) In violation of its duty as a trustee to protect and defend Zuni land, the United States continued to treat Zuni land as though it were public domain, conveying specific parcels to third parties, with no compensation to the Zuni Tribe.

(C) The United States provided services to Navajo Indians in the Ramah area and failed to prevent Anglo, Hispanic, and Navajo trespass onto Zuni lands.

(D) The United States allowed third parties to drive the Zunis from their lands and actively prevented the Zunis from controlling their land.

(E) The United States controlled the size of Zuni herds and restricted the size of their grazing area, thus depriving the Zuni people of their right to use their own lands.

(F) The United States, first by authorizing legislation and then by administrative action, created national forests, national parks, and national monuments on aboriginal lands, owned and occupied by the Zunis.

FINDING 34. *Description of Lands Taken Between 1901 and 1912:*

As a result of the aforementioned acts and omissions of the United States, the following lands were taken from the Zuni Indian Tribe by the United States:

Beginning at a point located at North Mountain in the State of Arizona; thence northwest to The Flattops located in the Petrified Forest National Park in the State of Arizona; thence north to The Haystacks located in the Petrified Forest National Park; thence northeast to a point located seven miles south of Gallup, New Mexico on State Highway 32; thence east to McGaffey, New Mexico; then southeast to the Ice Cave; thence in a southerly direction around the western fringe of the Malpais (lava flow) to the southernmost tip of said lava flow; then south on a line toward Allegros Mountain to a point due east of the Zuni Salt Lake; thence northwest to Veteado Mountain; thence west to the Zuni Salt Lake; thence northeast to Chimney Hill thence north to El Morro; thence northeast to Brennan Spring; thence due west to a point approximately ten miles south of Gallup, New Mexico on State Highway 32, thence southwest to Bluebird Well located in the State of Arizona; thence south to Witch Wells; thence south along Highway 666 to a point on the highway where it intersects a line between the Zuni Salt Lake in the State of New Mexico and North Mountain in the State of Arizona; thence west along said line to North Mountain, being the point of beginning.

This tract of land is depicted by cross-lines on Plaintiff's Exhibit 250.

### 4. TAKING OF ZUNI LANDS (1912–1924)

FINDING 35. *History of Taking of Zuni Land (1912–1924)*

The admission of both the States of Arizona and New Mexico into the union in 1912, under their respective enabling acts, entitled each state to four sections of land in each township. Although much of the Zuni claim area (aboriginal lands) was unsurveyed, the school sections were thus owned and administered by the states. With the western boundary of the reservation clearly marked, at this time, by the Arizona/New Mexico state line, surrounding ranchers began to press in on what had formerly been used exclusively by Zuni stockmen for the grazing of their cattle and sheep. In answer to the February 1912 peetition of Zuni leaders for more lands, the Commissioner of Indian Affairs suggested that individual Zuni members located outside of the reservation boundaries apply for individual allotments. Zuni Superintendent Robert J. Bauman persisted in requesting more lands for the Zunis, noting that "the Zunis have [traditionally] grazed their flocks very extensively outside of the reservation". Reservation land provided on a per capita basis only about one-sixth as much grazing land as any other Indian Reservation in New Mexico or Arizona.

Government officials who investigated conditions at Zuni during these years supported Zuni requests for additions to their reservation. In 1917, a small addition was finally made to both the north and south ends of the reservation. Despite these additions, the ZUnis still did not have nearly adequate grazing lands within the reservation confines and were increasingly beset with competitors for use of the off-reservation lands.

In 1917, there was increased allotment activity by the Navajos who submitted applications for some tracts of land north of the reservation and to the east near Ramah. Rural and isolated regions within the overall Zuni claim area remained largely unpopulated to 1917; however non-Zunis exercised control over much of the land. Zunis were discouraged from using their traditional hunting grounds to the south of the reservation in the Reserve area and some Zunis were arrested for hunting out of season by state officers. The period 1918 to 1924 was the busiest period in terms of land entries filed and entries far exceeded anything in the past. By 1924, Zuni stockmen were forced from their lands and consequently reduced their herds to 35,000 sheep, 6,000 goats and 500 cattle. Some Zunis resorted to leasing lands outside of the reservation; others continued to graze stock on their traditional lands and resisted paying for leases.

FINDING 36. *Acts and Omissions of the United States Resulting in Taking Zuni Lands (1912–1924):*

The following acts or omissions of the United States resulted in the loss of aboriginal land by plaintiff during the period 1912–1924:

(A) The United States granted state school lands to Arizona and New Mexico in violation of the Zunis' rights to said lands.

(B) The United States granted individual Indian allotments in an area to the north and to the east near Ramah, New Mexico to individual Navajos in violation of the Zunis' rights in that area.

(C) The United States permitted third parties to trespass upon Zuni lands and utilize said lands for their own purposes, forcing the Zuni people and their livestock off their lands.

FINDING 37. *Description of Lands Taken (1912–1924):*

As a result of the aforementioned acts and omissions of the United States, the following lands were taken from the Zuni Indian Tribe by the United States:

Beginning at a point on Highway 666 in the State of Arizona where it intersects a line from the Zuni Salt Lake in the State of New Mexico and North Mountain in the State of Arizona; thence north along said Highway 666 to Witch Wells, Arizona; thence southwest on a line between Witch Wells, Arizona and the Zuni Salt Lake in the State of New Mexico to a point where it intersects the Arizona/New Mexico state line; thence east to Casrpenter Lake; thence north to Brennan Spring; thence southeast to El Morro; thence sourth th Chimney Hill; thence southwest to the Zuni Salt Lake; thence west on a line from Zuni Salt Lake to North Mountain in the State of Arizona to a point where it intersects Highway 666 in the State of Arizona, being the point of beginning.

This tract of land is depicted by cross-lining on Plaintiff's Exhibit 251.

### 5. TAKING OF ZUNI LAND (1925–1935)

FINDING 38. *History of Taking of Zuni Land (1925–35)*

Although the Zuni Reservation had been surveyed in 1908, the Zunis continued to graze wherever they could, paying no attention to the reservation boundaries. Superintendent Trotter complained in 1927 of the absence of a map of the reservation, and in 1929 said that lines had never been definitely located and that there was much doubt as to the location of the reservation boundaries. Original stone corner markers had been removed.

In 1934, the Zunis continued to press for expansion of their reservation. The passage of the Taylor Grazing Act tended to limit the Zunis' ability to use what the United States onsidered to be "public lands". Fencing of the reservation was completed in 1935, finally confining Zuni grazing activity to the reservation. Although the Zuni people continually asked for additional land, by 1935 they had effectively been fenced out of surrounding public lands except in a small area to the north described in Finding No. 32. With that exception, all lands which are the subject of the instant suit were finally taken by the United States in 1935 by the fencing of the

Zuni Indian Reservation. Water from the Zuni River was impounded and diverted by the United States for the benefit of third parties as part of the Ramah Dam Project.

FINDING 39. *Acts and omissions of the United States resulting in Taking Zuni Land (1925–35):*

The following acts and omissions by the United States resulted in the loss of land by plaintiff from 1925 to 1935:

(A) The United States administered Zuni lands as public lands, allowing homesteads to be taken up by third parties.

(B) The United States implemented grazing reduction programs, thereby curtailing Zuni use of their own lands.

(C) The United States fenced the Zuni Reservation lands held in trust and attempted to confine the Zuni Indians to reservation trust lands only.

(D) The United States appropriated Zuni water for use by third parties, particularly for the Ramah Dam project, in violation of the Zunis' reserved water rights.

FINDING 40. *Description of Land Taken (1925–35):*

As a result of the aforementioned acts and omissions by the United States, the following lands were taken from the Zuni Indian Tribe by the United States:

> Beginning at a point at Witch Wells, Arizona; thence north to Bluebird Well; thence northeast to a point approximately ten miles south of Gallup, New Mexico on State Highway 32; thence due east to Bfrennan Spring; thence south to Carpenter Lake; thence west to a point on a line between the Zuni Salt Lake in the Sate of New Mexico and Witch Wells in the State of Arizona where said line intersects the Arizona/New Mexico state line; thence northeast to Witch Wells, Arizona, the point of beginning—excepting therefrom, however, the present Zuni Indian Reservation and the following described tract of land known as Area No. 6, to wit: All of the West; Township 10 North, Range 19 West; Township 11 North, Range 19 West; and Township 11 North, Range 18 West; except those portions of said Townships which are included in the present Zuni Indian Reservation.

This tract of land is depicted by cross-lining on Plaintiff's exhibit 252.

## 6. TAKING OF ZUNI LANDS (1936–1946)

FINDING 41. *History of Taking of Zuni Land (1936–46):*

Under the authority of the Indian Reorganization Act of 1934, the Bureau of Indian Affairs conducted a Sub-marginal Lands Acquisition Program in the Southwestern United States. The program as carried out at Zuni was designed to purchase or administratively transfer lands to be used for grazing by the Zuni Indian Tribe. By 1938, approximately, 100,000 acres surrounding the Zuni Reservation had been acquired by the project. That acreage outside of the then existing reservation boundaries was still being used exclusively and continually by the Zunis. The Zuni people fully expected the entire 100,000 acres to be added to the reservation, but Commissioner Collier, in 1939, administratively drew a "compromise line" excluding approximately 40,000 acres of the original 100,000 acres acquired by the sub-marginal land programs. A fence was constructed along the line and the Zunis excluded from the northern area. This tract of 40,000 acres taken from the Zunis by the administrative action of Commissioner Collier represents the last parcel of Zuni lands taken by the United States.

FINDING 42. *Acts and omissions by the United States Resulting in Taking Zuni Land (1936–46):*

The following acts and omissions by the United States resulted in the loss of land by the plaintiff during 1939:

The United States, through the administrative action of Commissioner John Collier, drew a line and fenced the Zuni people out of a 40,000 acre tract of land in the North Purchase area in 1939 and thereafter allowed individual Navajos to settle thereon and appropriate it for their own use in violation of the rights of the Zunis to said tract.

FINDING 43. *Description of Land Taken (1936–46):*

As a result of the aforementioned acts and omissions by the United States, the following lands were taken from the Zuni Tribe in 1939 by the United States:

All of Township 11 North, Range 21 West; Township 11 North, Range 20 West; Township 10 North, Range 19 West; Township 11 North, Range 19 West; and Township 11 North, Range 18 West; except those portions of said Townships which are included in the present Zuni Reservation.

This tract is depicted by cross-lining on Plaintiff's Exhibit 253.

### 7. SUMMARY OF TAKINGS OF ZUNI LAND

44. All of the Zuni land described above was taken, at the times stated, as a result of the acts or omissions of the United States. (A composite of all these tracts is depicted by cross-lining on plaintiff's exhibit 247.)

The United States has failed to pay or award any compensation for the Zuni lands taken by the United States.